# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01390-COA

**DEANNA RUDD**                                                          **APPELLANT**

**v.**

**STATE FARM FIRE AND CASUALTY**                               **APPELLEE**
**COMPANY**

DATE OF JUDGMENT:               09/11/2018
TRIAL JUDGE:                    HON. ROBERT P. KREBS
COURT FROM WHICH APPEALED:      JACKSON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        DOUGLAS LAMONT TYNES JR.
                                COURTNEY PARKER WILSON
ATTORNEYS FOR APPELLEE:         H. BENJAMIN MULLEN
                                MICHAEL RILEY MOORE
NATURE OF THE CASE:             CIVIL - INSURANCE
DISPOSITION:                    AFFIRMED - 05/05/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE J. WILSON, P.J., GREENLEE AND LAWRENCE, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     Following a car accident, Deanna Rudd filed suit against her insurance company, State

Farm Fire and Casualty Company (State Farm), claiming that she was entitled to

underinsured motorist (UIM) benefits. Rudd also asserted claims for breach of fiduciary

duty, negligence/gross negligence in claim handling, and bad faith. She sought extra-

contractual and punitive damages. State Farm filed a motion for partial summary judgment

on the issues of bad faith and extra contractual and punitive damages. The Jackson County

Circuit Court granted State Farm's motion, and Rudd appealed. Finding no genuine issues

of material fact, we affirm the circuit court's judgment.

**FACTS**

¶2.     On July 27, 2010, Rudd was driving southbound in the left lane on Market Street in Pascagoula, Mississippi.[1]  At the same time, Chrisma Houston was also driving southbound in the right lane on Market Street.[2]  Houston merged left and struck Rudd's vehicle.  Both vehicles were traveling between twenty-five and thirty miles per hour.  An ambulance arrived shortly after the collision.  During her initial emergency-medical-technician (EMT) interview, Rudd said she injured her back, neck, and left hip in the accident.

¶3.     At the time of the accident, Houston was insured through Allstate and had $25,000 in liability coverage.  Rudd was insured through State Farm and had $100,000 of uninsured/underinsured motorist coverage and $10,000 in medical pay coverage (Med Pay).  State Farm's records shows that, about a month before the accident, Rudd's husband requested that Rudd be removed from the policy because they were pursuing a divorce.  Rudd's husband died on July 14, 2010, roughly two weeks before the accident.  Based on Rudd's husband's request to remove Rudd from the policy, State Farm initially determined that coverage for Rudd was questionable.  On July 30, 2010, Rudd spoke with a State Farm agent and stated that she wanted to "handle everything" through Allstate—Houston's insurance carrier.  On August 4, 2010, Rudd told a State Farm agent that she would contact Allstate to determine whether a claim had been submitted.

---

[1] Rudd had one passenger in her vehicle.

[2] Houston had one passenger in her vehicle.

¶4.     On August 3, 2010, State Farm sent Rudd a letter detailing her Med Pay coverage,

which included reasonable and necessary medical expenses up to $10,000 per person.  On

September 1, 2010, State Farm confirmed that Allstate accepted liability for the accident and

was handling damages owed to Rudd.  By September 7, 2010, State Farm had collected

information that Rudd had made previous claims on other insurance policies for injuries she

suffered in falls, sudden impacts, and other car wrecks.  The records spanned from 1992 to

2008 and included the following:

a.      August 12, 1992—Rudd was in an automobile accident, suffering neck and right shoulder pain.  Dr. John McCloskey treated her injuries.

b.      April 8, 1994—Rudd was in an automobile accident, resulting in neck, left shoulder, and left jaw pain. She went physical therapy after that accident and was treated by Dr. McCloskey.

c.      July 3, 1998—Rudd was in an automobile accident, resulting in neck pain.  She was transported to the Singing River Hospital Emergency Room after the accident.  She was primarily treated by Dr. McCloskey.

d.      April 28, 2000—Rudd fell and injured her coccyx.  She reported the injury to Dr. McCloskey.

e.      August 8, 2001—Rudd was in an automobile accident, resulting in neck, back, and right shoulder pain.  She was transported to the Singing River Hospital Emergency Room after the accident.  She was primarily treated by Dr. McCloskey.

f.      December 8, 2001—Rudd ran into a glass door at McRae's.  She complained to Dr. McCloskey of left shoulder and wrist pain.

g.      2008—Rudd was treated at Bienville Orthopedics for a possible fractured wrist.

h.      May 24, 2008—Rudd was nearly hit by a bus at work, resulting in

3

injury to her back and neck. She was transported to the clinic at the Chevron Refinery before her husband took her to the emergency room in Mobile, Alabama. Dr. McCloskey treated her injuries.

State Farm obtained records showing that Rudd required significant medical treatment as a result of these injuries, including physical therapy and pharmaceutical drugs. On September 28, 2010, State Farm confirmed to Allstate that it was paying up to $10,000 for Rudd's Med Pay coverage.

¶5. On December 17, 2010, State Farm determined that Rudd had exhausted her Med Pay coverage. On July 28, 2011, State Farm sent Rudd's husband[3] a letter notifying him that State Farm intended to pursue collection from the responsible parties. State Farm's letter also notified Rudd that any lawsuit must be brought within the statutory time period. Between August 1, 2011, and August 15, 2012, State Farm continued handling Rudd's claim and communicating with Allstate. On November 5, 2012, State Farm agent Valarie Salter, received a call from Allstate and learned that Rudd had at least $42,000.00 in medical bills. On November 7, 2012, Allstate sent a letter asking State Farm to waive its subrogation interest. On December 17, 2012, State Farm notified Allstate that it agreed to waive its subrogation claim for payments made under the Med Pay portion of its policy.

¶6. On December 27, 2012, State Farm claim representative Ann McClendon reviewed all of Rudd's medical records to determine how much UM/UIM exposure was present. On

_____

[3] Rudd's husband was deceased, but he was still listed as the policy holder. Because neither Rudd nor her husband lived at the address where they lived while married, the letter was returned as undeliverable.

4

January 11, 2013, Rudd called McClendon and left a voicemail stating that she was ready to settle her bodily injury claim. A few days later, Rudd left a voicemail with another State Farm representative, inquiring about the status of her claim. That representative informed Rudd that McClendon was still evaluating her claim.

¶7. On January 31, 2013, McClendon sent Rudd a letter stating that State Farm had "re-evaluated [her] claim, including the additional information provided, and determined the value remains within the available limits of the responsible party." As a result, State Farm determined that Rudd was not entitled to payment under UM/UIM Coverage. McClendon also reminded Rudd of the statute of limitations. According to State Farm's records, McClendon determined that Rudd was ineligible for UM/UIM coverage because of a seven-month gap in her treatment, she was receiving disability benefits, and she was being treated for pre-existing injuries at the time of the accident. McClendon also noted that, between Allstate and State Farm, Rudd had received a total of $35,000. McClendon further determined that this sum covered all of Rudd's medical bills that were attributable to the July 2010 accident. Rudd did not respond to the letter.

¶8. On March 13, 2013, State Farm closed Rudd's file pending any future response from Rudd. Rudd contacted McClendon on May 9, 2013, to discuss her claim. McClendon offered to contact Allstate to retrieve Rudd's medical records, but Rudd claimed she could retrieve them faster. McClendon informed Rudd that she may need prior records, including workers' compensation records. McClendon explained multiple times that she did not mind

5

handling everything, but Rudd proceeded anyway.

¶9.    On May 21, 2013, Rudd called McClendon to tell her she had the medical records from Allstate and that she would fax them. On June 11, 2013, Rudd called McClendon to discuss her claim. McClendon stated that she received a large amount of medical records from Rudd on May 27 and that she would review the records and get back to Rudd. McClendon also noted that Rudd was still receiving medical treatment and had additional records to send.

¶10.    On July 10, 2013, State Farm wrote Rudd stating that they received her claim but had been unable to reach her by phone. McClendon observed that some of the bills and records submitted by Rudd did not appear to be related to her claim. On July 15, 2013, McClendon called Rudd to discuss her claim. Rudd revealed that prior to the accident, she was treated for fibromyalgia by Dr. Thomas Yearwood. She further revealed that she had previously undergone surgeries to her shoulder and both knees, she had two workers' compensation claims, and she was on Medicare and Medicaid. McClendon informed Rudd that she was ordering records from Dr. William Evans, Dr. Yearwood, Dr. John McCloskey, and Dr. Chris Wiggins for the five years prior to the accident. McClendon also told Rudd that the records would not arrive and would not be reviewed by July 27, 2013, which was when the statute-of-limitations period was set to run. McClendon explained that if Rudd did not file suit to protect against a statute-of-limitations defense, then there would be nothing more State Farm could do. Following their conversation, McClendon sent Rudd a follow-up letter, again

reminding her that her claim was subject to a three-year statute of limitations.

¶11. On July 22, 2013, Rudd called State Farm and left a message for McClendon informing McClendon that Rudd was sending her over 200 pages of medical records. Two days later, Rudd and McClendon spoke on the phone, and McClendon told Rudd that she still had not received the records Rudd mailed to her. Rudd stated that she would fax the records to McClendon. McClendon "stressed and stressed" that the statute of limitations was set to run on July 27, 2013, and that McClendon would not receive or be able to review all of the past medical records by that time.

¶12. On July 25, 2013, Rudd called McClendon to discuss the status of her claim. McClendon stated that she had received Rudd's fax but reiterated that she could not guarantee she would have an opportunity to fully review the records or resolve the claim before the statute-of-limitations period expired. Rudd filed her complaint the following day. On August 26, 2013, McClendon received a call from Rudd regarding the status of Rudd's claim. Rudd stated that she sent McClendon all medical records on July 24 or 25. At the time, McClendon was under the impression that Rudd intended to send even more records. McClendon told Rudd that she would review them and call her back upon completion. Rudd called McClendon the next day to ask about the status of her claim. McClendon stated that she still had not received the records from Singing River Hospital that she requested on July 15. Rudd thought that those records had been sent to State Farm on July 24, and McClendon advised that she would check the large volume of records provided that day to determine

7

whether they were present.

¶13.    In an injury evaluation prepared on August 27, 2013, McClendon described how Rudd's injuries pre-dated the July 2010 accident and that she had been complaining of the same pain in her neck, back, shoulders, hips, thighs, arms, legs, and buttocks since 1999. McClendon determined that the treatment on the date of the loss and approximately two months after should be related to the accident. However, after that initial two-month period of treatment, Rudd waited seven months before seeking further treatment. McClendon further observed that the number of radiology studies ordered by Dr. McCloskey seemed excessive, especially in light of the fact that all the results were unremarkable. In addition, Rudd had been diagnosed with fibromyalgia. As recent as 2009, Rudd's physicians observed that she was in constant pain and suffered from a number of physical and psychological issues. McClendon observed that the symptoms reported during this period mirrored the symptoms Rudd reported after the July 2010 accident.

¶14.    McClendon called Rudd to tell her that she had reviewed all the available records and that she was sending her report to management for a decision as to the claim. McClendon also noted that she still had not received the Singing River Hospital medical records she requested on July 15. Based on the records before her, McClendon determined that only $13,531.50 in medical bills were related to the July 2010 accident that had aggravated Rudd's pre-existing conditions. McClendon then observed that Allstate paid Rudd $25,000 in liability coverage and $1,886.28 for property damage, and State Farm paid her $10,000 under

8

her Med Pay coverage for her related medical expenses.

¶15. On September 20, 2013, McClendon called Rudd and explained that she had finally been able to review all of Rudd's medical records. McClendon explained that she believed that Rudd had already been compensated for all of her injuries related to the July 2010 accident. She offered Rudd $1,000 to resolve the claim, but Rudd rejected the offer. Rudd also informed McClendon that she had filed suit on July 26. Rudd said that she did not have an attorney but that she would retain one. When McClendon spoke with the circuit clerk, he stated that suit had been filed, but the circuit court did not have any record that summons was served on State Farm. McClendon called Rudd to inform her that her attorney needed to serve State Farm with a copy of her complaint.

¶16. On November 4, 2013, McClendon sent Rudd an advance of $1,000 in an effort to resolve her claim. On November 12, 2013, Rudd filed her amended complaint, alleging that State Farm dealt with her in bad faith on the basis that State Farm improperly denied her UIM claim. As a result, Rudd sought extra-contractual and punitive damages. State Farm filed a motion for partial summary judgment on Rudd's bad faith claim. The circuit court granted State Farm's motion and certified the judgment under Mississippi Rule of Civil Procedure 54(b).[4] Aggrieved, Rudd appeals.

**STANDARD OF REVIEW**

---

[4] Rudd initially filed a petition for an interlocutory appeal. On January 10, 2019, the Mississippi Supreme Court entered an en banc order finding that the appeal should be treated as a timely appeal from a final judgment.

¶17. We review a trial court's grant or denial of summary judgment de novo. *Miss. Dep't of Revenue v. Hotel & Rest. Supply*, 192 So. 3d 942, 945 (¶5) (Miss. 2016). A party is entitled to summary judgment if the record shows that there is no genuine issue of material fact and that the party is entitled to a judgment as a matter of law. M.R.C.P. 56(c). We review the summary judgment record in the light most favorable to the nonmoving party. *Thomas v. Chevron U.S.A. Inc.*, 212 So. 3d 58, 60 (¶7) (Miss. 2017). However, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in [Mississippi Rule of Civil Procedure 56], must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e). "To withstand summary judgment, the party opposing the motion must present sufficient proof to establish each element of each claim." *Sharrieff v. DBA Auto. Two LLC*, 242 So. 3d 944, 947 (¶9) (Miss. Ct. App. 2018).

## ANALYSIS

¶18. Rudd argues on appeal that the circuit court erred in finding no genuine issue of material fact existed regarding her bad-faith claim.[5] The Mississippi Supreme Court has stated that punitive damages "are recoverable where the breach results from an intentional

---

[5] In her complaint, Rudd sought both extra-contractual damages and punitive damages. The circuit court granted partial summary judgment on both issues. We recognize that "[t]o award extra-contractual damages, [a] jury [must find] that the mental anguish and emotional distress of the plaintiffs was 'an independent and intentional tort separate from the breach of contract.'" *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992). Rudd did not raise this issue on appeal.

wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort." *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095 (Miss. 1996) (quoting *Blue Cross & Blue Shield v. Maas*, 516 So. 2d 495, 496 (Miss. 1987)). "To recover punitive damages from an insurer for 'bad faith', the insured must prove by a preponderance of evidence that the insurer acted with (1) malice, or (2) gross negligence or reckless disregard for the rights of others." *Id*. (citing *Veasley*, 610 So. 2d at 293). Further, "[t]he insurer's only obligation is to perform a prompt and adequate investigation of the claim and to deal with the claimant in good faith." *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 535 (Miss. 2003).

¶19.    In her motion for partial summary judgment, Rudd attached State Farm's activity log, which we thoroughly detailed in the facts above. State Farm's records show that it began investigating Rudd's claim as soon as it was reported. State Farm continued communication with both Rudd and Allstate agents throughout the entire claims process, paying Rudd's medical bills until her Med Pay coverage was exhausted. Additionally, State Farm agents made diligent efforts to maintain communication with Rudd, update her on her claim, and assist her in her claim. Agents also repeatedly notified Rudd of the impending statute of limitations. When State Farm sought to obtain other necessary medical records, Rudd insisted that she would retrieve them because she could get them faster. Even so, State Farm continued its efforts to retrieve necessary medical records and inform Rudd of the records it had not yet received. Accordingly, we find the claim-activity log demonstrates State Farm's prompt and adequate investigation of Rudd's claim for UIM benefits.

11

¶20. In denying her claim, State Farm determined that many of Rudd's injuries predated the 2010 accident, and, after two months of initial treatment following the accident, Rudd waited seven months before seeking further treatment. After review of the record, we find the circuit court correctly held that there was no genuine issue of material fact that State Farm acted maliciously, was grossly negligent, or acted in reckless disregard in handling her claim. Although Rudd may dispute State Farm's assessment of the value of her claim, that dispute in and of itself cannot serve as a basis for a bad faith/punitive damages cause of action. *State Farm Mut. Auto. Ins. Co. v. Roberts*, 379 So. 2d 321, 322 (Miss. 1980) (A legitimate "pocketbook" dispute cannot support a claim for bad faith or punitive damages.). Therefore, we affirm the circuit court's grant of summary judgment.

¶21. **AFFIRMED.**

BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR.